**John R. CUMMINGS, et al.**

v.

**A.G. EDWARDS & SONS, INC., et al.**

**Civ. A. No. 86–73–B.**

United States District Court, M.D. Louisiana.

March 15, 1990.

See also 637 F.Supp. 132.

Dennis J. Hauge, Breazeale, Sachse & Wilson, Baton Rouge, La., for plaintiffs.

Fredrick R. Tulley, Taylor, Porter, Brooks & Phillips, Baton Rouge, La., for defendants.

POLOZOLA, District Judge.

This suit was filed by John R. Cummings and his wife, Catherine, under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 of the Securities and Exchange Commission. 17 C.F.R. § 240.10b–5. Named as defendants in this suit are A.G. Edwards & Sons, Inc. and Alfonso Schiebel. Plaintiff contends that defendants are liable for various violations of the securities laws including churning, misrepresentations, and failure to disclose material facts.

In January of 1983, Cummings entered into a customer agreement with A.G. Edwards & Sons, Inc. (A.G. Edwards). Cummings had recently retired and his wife hoped to retire in 1984. Prior to signing the agreement, Cummings discussed his family's financial status and goals with Alfonso Schiebel, an investment broker with A.G. Edwards. After discussing various goals, Schiebel submitted an investment proposal which outlined specific investments to achieve an income goal of $24,000 a year by February of 1984. Cummings and A.G. Edwards then executed a customer agreement which included a securities account, a margin account, and an option account.

In February of 1983, the Cummings deposited cash and stocks valued at $64,-312.03 into their customer accounts at A.G. Edwards. The account was closed on De-cember 31, 1985 with an equity value of $23,577.04. Being dissatisfied with the results they obtained from their investments with A.G. Edwards, the plaintiffs instituted this suit.

As noted earlier, the plaintiffs assert three basic claims against the defendants. Each of these claims will be discussed separately.

### I. Churning

■ "Churning occurs when a broker 'enters into transactions and manages a client's account for the purpose of generating commissions and in disregard of his client's interest.' "[1]

The Fifth Circuit set forth the prerequisites an investor must prove in order to recover on a churning violation under section 10(b) and Rule 10b–5 in *Miley v. Oppenheimer & Co.*, 637 F.2d 318, 324 (5th Cir.1981). According to *Miley,* the investor must prove that (1) the trading in his account was excessive in light of his investment objectives; (2) the broker in question exercised control over the trading in the account; and, (3) the broker acted with the intent to defraud or with willful and reckless disregard for the investor's interest. Thus, it is necessary for the Court to analyze each of these elements of this case.

### A. *Excessive Trading*

The Cummings' deposited cash and stocks valued at $64,312.03 into their customer accounts at A.G. Edwards in February of 1983. This account was closed on December 31, 1985 with an equity value of $23,577.04. During this period of time, stock purchases, including purchases on the margin, totalled $171,179.12. Stock sales during this same period totalled $128,312.54. The total amount of options purchased during the period amounted to $4,643.27 while option sales totalled $10,-510.73. The record also reveals that the Cummings also made several miscellaneous withdrawals for taxes and for college tuition. A.G. Edwards received margin inter-

**1.** *Romano v. Merrill Lynch, Pierce, Fenner & Smith,* 834 F.2d 523, at 525, n. 1 (5th Cir.1987), *cert. denied,* 487 U.S. 1205, 108 S.Ct. 2846, 101 L.Ed.2d 883 (1988), citing *Miley v. Oppenheimer & Co.,* 637 F.2d 318, 324 (5th Cir.1981).

est payments in 1983, 1984 and 1985 in the sum of $12,730. A.G. Edwards also received commissions of $5,298.64 during the same period. There were 37 separate transactions involving the Cummings' account from February of 1983 to December 31, 1985. Considering the original investment objectives of the Cummings, the amount of trading on this account initially appears to be suspicious. However, the evidence clearly shows that John Cummings altered his investment objectives shortly after he submitted his original investment proposal to Al Schiebel. The testimony of John Cummings, Alfonso Schiebel and Charles H. Long, Jr., Schiebel's manager at A.G. Edwards, all support the finding that John Cummings pursued an investment strategy somewhat more aggressive than the normal retirement investor. This conclusion is further supported by the testimony which indicated that John Cummings was a regular visitor in the A.G. Edwards office located in Baton Rouge where he had access to current market information, research material and contact with other investors; John Cummings regularly reviewed and studied information available in the A.G. Edwards office; and John Cummings met with Alfonso Schiebel on a consistent basis where investment strategies and procedures were discussed in great detail. Furthermore, the evidence is clear that John Cummings never revealed to his wife that the actual investments made by him were different from those contained in the initial proposal nor did he tell Mrs. Cummings that he had decided to begin trading stocks and buying and selling options on stock owned by the Cummings. In fact, John Cummings did not even tell his wife that the A.G. Edwards account had been closed and that he had opened a stock account with Merrill Lynch. It is clear that where "the goals of the investor are aggressive, it is easier to conclude trading was not excessive."[2] Furthermore, the plaintiffs failed to introduce any expert testimony to support their

contention that trading was excessive in light of the investment objectives. Expert testimony is particularly important on this issue.[3] Thus, in *Hotmar v. Lowell H. Listrom & Co.*, 808 F.2d 1384, 1386 (10th Cir.1987), the Court stated:

A traditional method of showing excessive trading in an account is by presenting an expert who will testify to such items as the "turnover rate" and the "in and out trading" in a particular account. Hotmar called no such expert, and although such does not in itself defeat his claim, he did proceed at some risk by not presenting such type of testimony.

The Fifth Circuit reached a similar result in *Miley v. Oppenheimer & Co.*, 637 F.2d 318 at 325, wherein the Court stated:

As in most churning cases, Miley then had an expert testify that in light of these investment objectives, the transactions in the account were excessive in size and frequency.

Thus, the Court finds that the plaintiffs failed to prove that the trading was excessive in light of investment objectives.

### B. *Control*

Even if the trading could be deemed excessive, the plaintiffs also failed to prove that Schiebel and A.G. Edwards exercised the requisite control over the accounts. The Cummings contend that they had no prior education or experience in investments of this nature. The record reveals that John Cummings attended two years of junior college and worked for Ethyl Corporation for thirty years. Catherine Cummings has a high school education and had worked for the Louisiana Farm Bureau as an underwriter. All of the stocks which the Cummings owned prior to their relationship with A.G. Edwards were acquired through an employee purchase plan at Ethyl. However, the lack of knowledge and experience does not alone amount to control. As noted earlier, John Cummings

---

**2.** *Hotmar v. Lowell H. Listrom & Co.*, 808 F.2d 1384, 1386 (10th Cir.1987).

**3.** The Cummings were not permitted to call any experts because of their failure to comply with the scheduling order set by the Court in accordance with Rule 16 of the Federal Rules of Civil Procedure.

was actively involved in the aggressive investment strategy and it is clear that John Cummings was actively involved in decisions concerning investments, trading stocks, buying and selling options, the sale of the Ethyl stock, and in the decision to retain one stock, Western Union, against the advice of both Schiebel and Long. In this regard, although Schiebel and Long advised John Cummings to sell the Western Union stock to cut his losses, John Cummings refused to do so. He even testified that his philosophy was to ride the stock market to see if it would go back up. It is also clear that John Cummings reviewed the transactions and monthly statements on a regular basis. Considering Cummings' extensive involvement in the investment decisions, the Court finds that the broker in this case did not exercise the requisite control required to impose liability in this case.

## C. Intent to Defraud

The plaintiffs also fail to prove an essential element of any claim filed under section 10(b) and Rule 10b–5—the element of scienter.[4] It is clear that the mere fact that the Cummings sustained substantial losses and A.G. Edwards received substantial margin interest in payments and commissions do not alone establish churning nor any of its elements. *Hotmar*, 808 F.2d at 1386. In this case, the plaintiffs offer no additional evidence indicating that Schiebel or A.G. Edwards were fraudulent or reckless in the handling of Cummings' accounts. The Court also finds none after independent evaluation of this case. Therefore, the Court finds that the plaintiffs have not proven that the defendants acted with the intent to defraud in this case.

## II. Misrepresentation and Failure to Disclose

■ The Cummings also seek to recover under section 10(b) and Rule 10b–5 for misrepresentation and failure to disclose.

In *Stephenson v. Paine, Webber, Jackson & Curtis, Inc.*, 839 F.2d 1095 (5th Cir. 1988), cert. denied, —— U.S. ——, 109 S.Ct. 310, 102 L.Ed.2d 328 (1988), the Fifth Circuit set forth the following elements that are required to support a recovery under section 10(b) and Rule 10b–5 for misrepresentation or omission: (1) a material misrepresentation or omission by the defendant; (2) scienter on the part of the defendant; (3) reliance, and (4) due diligence by the plaintiffs to pursue their own interests with care and good faith. Each of these elements will be discussed separately.

### A. A material misrepresentation or omission

Plaintiffs contend that the high risk nature of stock investments, margin purchases, and option trading were never fully disclosed to them by the defendants. John Cummings testified that he did not understand what a margin purchase was at the time the margin account was opened and purchases on margin were made for him and his wife. He also testified that he did not fully understand options as of the day of the trial. In fact, John Cummings testified that he had never heard of the Great Depression although he lived during this time period. It is obvious to the Court that credibility of the witnesses was an obvious issue in this case. The Court did in fact take the credibility of the witnesses into consideration in reaching its conclusions of fact in this case.

A review of the record reveals that the initial proposal prepared by Schiebel specifically stated as follows: "That trading in the stock market involves higher than average risk." Considering the active involvement of John Cummings in this case and the various waivers set forth in the documents signed by him, including the general information and assumptions document filed in evidence as plaintiffs exhibit No. 11, the Court finds it highly unlikely that John Cummings did not understand the risk inherent in stock and securities investments.

---

4. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Stephenson v. Paine Webber Jackson & Curtis, Inc.*, 839 F.2d 1095 (5th Cir.1988), cert. denied, —— U.S. ——, 109 S.Ct. 310, 102 L.Ed.2d 328 (1988); *Romano*, 834 F.2d 523; *Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885 (5th Cir.1987); and *Miley*, 637 F.2d 318.

The "duty to disclose information about risk will vary depending upon the circumstances and the nature of the relationship between the broker and the customer."[5] The factors to be considered are the degree of trust placed in the broker and the intelligence and personality of the customer.[6] A broker may have breached his duty to disclose information if he "knowingly omitted material facts in what he said to [the investor] if such facts were necessary under the circumstances to make his statements to [the investor] not misleading."[7]

After reviewing the evidence in this case, the Court does not find any misrepresentations made by the defendants to the Cummings. However, the Court does find that material omissions did occur. Schiebel testified at the trial of this case that he considered John Cummings to be an "average" investor in regards to sophistication. However, John Cummings did not have any substantial experience or education in the stock and securities market as of the time the initial agreement was signed in 1983. Thus, Schiebel had a duty to fully explain the risk involved in more aggressive investment strategies and specifically had a duty to advise the Cummings of the potential liability for margin loans and interest. It appears to the Court that Schiebel assumed that Cummings was more sophisticated than he actually was at the commencement of their relationship in 1983.

### B. *Scienter*

It is also necessary to determine whether or not the requisite scienter has been proven by the plaintiffs in order to recover on a basis of misrepresentation under § 10(b) and Rule 10b–5. The Court finds that the plaintiffs failed to show the requisite scienter. It is clear that more than negligence is required to recover under § 10(b) and 10b–5. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The plaintiff failed to produce any specific evidence of fraud or recklessness. The record does reveal that Schiebel freely shared information with John Cummings during their frequent contacts although Schiebel may have carelessly failed to disclose unrequested information. Furthermore, the evidence is clear that John Cummings regularly received and reviewed the transactions and monthly statements. In addition, John Cummings had frequent personal contact with Schiebel. Thus, the Court finds that the evidence fails to show the requisite scienter on the part of the defendants to impose liability under the facts of this case.

### C. *Reliance and Due Diligence*

Because the plaintiffs have failed to prove the requisite scienter, it is not necessary for the Court to discuss whether there was proper reliance on the part of the Cummings and due diligence exercised by the plaintiffs to pursue their interests with care and good faith.

### Conclusion

In summary, the Court finds that the plaintiffs have failed to prove the requisite elements to recover under section 10(b) and Rule 10b–5 for churning, misrepresentation or failure to disclose material information.

Therefore, since plaintiffs have failed to prove the requisite elements of their claims, plaintiffs' claims must be dismissed with prejudice.

The Court also dismisses the defendant's counterclaim for expenses in defending this action.

Therefore:

IT IS ORDERED that judgment be entered dismissing plaintiffs' suit with prejudice.

IT IS FURTHER ORDERED that judgment shall also be entered dismissing defendant's counterclaim with prejudice.

Judgment shall be entered accordingly.

**5.** *Romano*, 834 F.2d at 530 citing *Clayton Brokerage Co. v. Commodity Futures Trading Commission*, 794 F.2d 573 (11th Cir.1986).

**6.** *Id.*

**7.** *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 803 F.2d 454, 460 (9th Cir.1986).